FILED

19 NOV 27 PM 2: 46

CLERK U.S. DISTRICT COURT
WESTERN ~~~ OF TEXAS
BY_____
~~~ CLERK

| | | |
|---|---|---|
| Marilyn Roth Epstein, Stephan B. Epstein, and BEIT NES LLC, *Plaintiffs*, | § § § § | |
| v. | § § | **CIVIL ACTION NO. 1:19-cv-00495-RP** |
| 5AIF Sycamore 2, LLC, *Defendant*. | § § § § | ORAL ARGUMENT REQUESTED |

## SECOND AMENDED COMPLAINT

### INTRODUCTION

1.      This case is about the flagrantly illegal and improper conduct of a "hard money lender," 5AIF Sycamore 2, LLC ("Defendant 5AIF" or "Defendant"), through its below-referenced agents, in executing and coordinating a massively illegal transaction with the nefarious goal of illegally acquiring the real property (the "Homestead Property") of Plaintiff Marilyn Roth Epstein ("Mrs. Epstein") and her husband, Plaintiff Stephan B. Epstein (collectively, the "Epsteins"). This conduct violated the Texas Constitution and other Texas laws, caused extensive damages to Plaintiff Epstein, and rendered the May 7, 2019 purported substitute trustee sale of the Homestead Property unlawful and *void ab initio*.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the property that is the subject of this action is situated in this judicial district.

## PARTIES

4. Plaintiff Marilyn Roth Epstein is a natural person whose residence and homestead are in Travis County, Texas.

5. Plaintiff Stephan B. Epstein is a natural person whose residence and homestead are in Travis County, Texas.

6. Plaintiff Beit Nes LLC is a Texas limited liability company having a principal place of business located in Travis County, Texas.

7. Defendant 5AIF Sycamore 2, LLC ('Defendant" or "Defendant 5AIF") is a California limited liability company having a principal place of business located in Irvine, California.

## FACTUAL ALLEGATIONS

### Background/The Homestead Property

8. Although the title is in the name of Beit Nes LLC as a result of illegal conduct perpetrated by the Defendant, Plaintiff Epstein and her husband, Stephan B. Epstein ("Mr. Epstein"), are the real owners of the property located at 31 St. Stephans School Road, Austin, Texas 78746 (the "Homestead Property"). Beit Nes LLC was interposed as the owner of the Homestead Property, at the insistence of the Defendant 5AIF as it was aware that Plaintiff Epstein was under duress to save her homestead, and strictly for the purpose of closing on a cash-out refinance loan from the Defendant.

9. The Epsteins reside at the Property, which is their Homestead, and they never intended to relinquish their Texas Constitution, Article XVI, §50a(6) homestead rights. (Marilyn Epstein Aff. ¶ 1.)

10. The Epsteins are the owners of the property located at 31 St. Stephens School Road, Austin, Texas 78746 ("Homestead" or the "Property"). BEIT NES LLC is a holding company for the purpose of closing on a cash-out refinance loan from the Defendant. (Id.)

11.    The Epsteins reside at the Property, which is their Homestead and never intended to relinquish their homestead rights. However, they have been temporarily staying at another residential property they own while the Property is under renovation. In approximately November 1999, Mrs. Epstein purchased the Homestead Property, moving in with her children and another family member. As she explained to representatives of the Defendant, Byron Lusk and Spencer Weaver, (the "Brokers") the Property has been her Homestead heretofore, except in 2011 when she sold the Property to another person, providing seller financing. Within a year and half she got the Property, moved back to the Property, and resumed using the Property as her Homestead. The Property is her dream house and she has been improving the Property to reach its full potential. From time to time she temporarily stayed at the other Property she owned in order to make improvements. Aside from these instances she and her children lived in the Homestead Property continuously until she met and married Mr. Epstein in 2003, who moved in with her and her children. (Marilyn Epstein Aff. ¶ 2.)

12.    On December 8, 2006, the Epsteins closed on a home equity loan for $584,000.00, using their Homestead as collateral, securing the equity loan by a Deed of Trust ("DOT1"). (Marilyn Epstein Aff. ¶ 3.)

13.    Mrs. Epstein was referred to Byron Lusk and talked to him on or about September 6, 2017. Around that time Mr. Lusk introduced her to his partner, Spencer Weaver over the phone. She never met them in person. Mrs. Epstein spoke to them exclusively over the phone, or exchanged emails or texts. She had at least a couple of conference calls with both Brokers before closing. During one of the conference calls the Brokers said they were partners and split income. Mr. Weaver's title on his email reflected he worked directly for the Defendant. In at least one of their conference calls around September 6, 2017, both said they worked for the Defendant and the Defendant would loan her approximately $2,200,000 and close within ten days. (Marilyn Epstein Aff. ¶ 4.)

14. In their early conversations, she explained to both Brokers that although she and her husband were temporarily staying at another property, that 31 St. Stephens School Road, Austin, Texas 78746 was their Homestead, and she wanted the loan to complete the remodeling on the Property and move back into their Homestead. Both Brokers said there would be no restrictions on the use of the funds. (Marilyn Epstein Aff. ¶ 5.)

15. On September 13, 2017, Mr. Lusk requested that Mrs. Epstein sign a blank residential loan application to refinance the December 8, 2006 home equity loan on the Homestead Property. Mr. Lusk said he would fill out the application and provide the completed application to her in short order. Mr. Lusk or Mr. Weaver never followed up on that commitment and the completed loan application was not included in the closing documents. Mrs. Epstein was not represented by legal counsel. (Marilyn Epstein Aff. ¶ 6.)

16. The residential loan application listed Mrs. Epstein as the borrower, and she signed the residential loan application in her individual capacity and as the owner of the Homestead Property. (Marilyn Epstein Aff. ¶ 7.)

17. On September 6, 2017, Mrs. Epstein informed the Brokers of her urgent need to refinance her December 8, 2006 home equity loan with the maturity date on or about by September 14, 2017. The Brokers said she would close September 14, 2017. However, she did not close until September 18, 2017, requiring her to request an additional extension from Nationstar, the DOT1 lender, who had already modified the loan. In exchange for the extension Nationstar required her to agree to sign over the Property to Nationstar if the closing with the Defendant fell through. (Marilyn Epstein Aff. ¶ 8.)

18. Before Mrs. Epstein signed the blank residential loan application, the Brokers stated the Defendant could refinance the home equity loan and that they could lend her $2,200,000.00 to use the cash-out for any purpose, as was the case with the December 8, 2006 home equity loan. The lien is an

equity lien. (Marilyn Epstein Aff. ¶ 9.)

19.     The Brokers told her that the offer of $2,200,000.00 was based on an As-Is Appraisal of the Property ordered by the Defendant and dated September 11, 2017, which Appraisal estimated the market value of the property as $2,500,000.00.  They subsequently lowered the loan amount repeatedly and substantially. (Marilyn Epstein Aff. ¶ 10.)

20.     On September 18, 2017, Mrs. Epstein closed on the refinance loan with Defendant 5AIF Sycamore 2, LLC ("5AIF"), secured by a Deed of Trust (DOT2).  (the "Note"). (Marilyn Epstein Aff. ¶ 11.)

21.     The original loan amount of the Note was $1,625,000.00. (Marilyn Epstein Aff. ¶ 12.)

22.     The monthly loan payment was $12,187.50. (Marilyn Epstein Aff. ¶ 13.)

23.     The original mortgagee is 5 Arch Funding Corp. (Marilyn Epstein Aff. ¶ 14.)

24.     The original trustee is Eric Gardner.  (Marilyn Epstein Aff. ¶ 15.)

25.     Defendant 5AIF Sycamore 2, LLC is the current mortgagee. (Marilyn Epstein Aff. ¶ 16.)

26.     FCI Lender Services, Inc. is the current loan servicer.  (Marilyn Epstein Aff. ¶ 17.)

27.     Attorneys for Miller, Watson & George, P.C. are designated as the current substitute trustee. (Marilyn Epstein Aff. ¶ 18.)

28.     A day or two before the initial scheduled closing for September 14, 2019, the Brokers told Mrs. Epstein, for the first time, that to close on the Note, she and her husband, Mr. Epstein, needed to transfer the title to a business entity.  She raised the concern that she and her husband planned to move back into the Property after remodeling, and that they did not want to relinquish their homestead. (Marilyn Epstein Aff. ¶ 19.)

29.     The Brokers told her that the legal effect of transferring the property to an entity, wholly owned by her and her was that they could still reside at and use the property as our homestead. She and

her husband believed the Brokers. (Marilyn Epstein Aff. ¶ 20.)

30.     On September 14, 2017, at the insistence of Mr. Lusk and Mr. Weaver, Mrs. Epstein and her husband transferred title of the Homestead Property to the business entity Beit Nes, LLC. (Marilyn Epstein Aff. ¶ 21.)

31.     The Brokers required Mrs. Epstein to sign a non-homestead affidavit and an Affidavit Concerning Business Purpose and Non-Owner Occupancy. These affidavits were buried in the closing documents. Mrs. Epstein did not realize she signed the affidavits. The Brokers, nor any other representative of the Defendant ever explained that the closing documents included these affidavits or their meaning. Mr. Epstein, on the other hand, never signed a non-homestead affidavit. (Marilyn Epstein Aff. ¶ 22.)

32.     At least two or three days before the initial closing date, September 14, 2017, Mrs. Epstein called the Brokers and title company and spoke to each and explained that she needed to get the closing documents before the closing date, so that she could read and understand the documents. She explained to the Broker that she had been in two car accidents in 2014 and 2015, respectively, and suffered concussions, and that her ability to comprehend was impaired by the accidents. She lost her mother from the first accident. She explained that as a result of the accidents any situations causing stress would induce ocular migraines, so she needed time to read the documents free from pressure. However, no one provided Mrs. Epstein the closing documents before the actual closing. At the closing the Brokers were not present nor explained to her what was in the documents before she signed, and she did not recall signing those affidavits. (Marilyn Epstein Aff. ¶ 23.)

33.     If the Defendant's representatives had sent the closing documents prior to the closing as Mrs. Epstein had requested, she would have retained competent legal counsel to review the documents to advise her as to their contents and the legal implications of her signing anything. By failing to send

her the documents, the Brokers took away Mrs. Epstein's option to have legal counsel review the documents and advise her accordingly. In other words, they handcuffed her ability to get advice from competent legal counsel prior to the closing. (Marilyn Epstein Aff. ¶ 24.)

34. When Mrs. Epstein and her husband were in the closing, Mrs. Epstein was still under the misinformation provided to her by the Brokers about she and her husband's right to remain in their homestead and other deliberate misinformation the Brokers provided, as discussed. (Marilyn Epstein Aff. ¶ 25.)

35. Once in the closing, Mrs. Epstein felt rushed and felt she did not have time to read the 75 pages of documents, which she wanted competent legal counsel to review prior to the closing, in any event. Mrs. Epstein felt she had approximately 15 minutes or so to review the documents given the lateness of the day and the deadline to refinance the preexisting home equity loan, and to sign the various documents. She felt she was under tremendous pressure. Given the approximate 15-minute or so review, she was not aware of what she was signing, the very reason she wanted the documents earlier, which she would have provided to competent legal counsel. (Marilyn Epstein Aff. ¶ 26.)

36. The Closing Statement dated September 18, 2017 indicates in the top right-hand corner that the loan amount is for $2,031,250.00. (Marilyn Epstein Aff. ¶ 27.)

37. Despite the fact that Mrs. Epstein had requested the closing documents from Defendant 5AIF on numerous occasions several days prior to the September 18, 2017 closing, which Defendant 5AIF failed to provide, Defendant 5AIF imposed dramatic changes just prior to the closing, as reflected on the Closing Statement, such as: (1) the loan amount was changed to $1,625,000.00; and (2) the closing costs were increased and approximately $100,000.00, including high commissions to the Brokers. (Marilyn Epstein Aff. ¶ 28.)

38. Moreover, just prior to the September 18, 2017 closing, Broker Spencer Weaver told Mrs.

Epstein, for the first time, that the loan term would only be one year and that Defendant 5AIF would either refinance the loan or give her a six-month extension. (Marilyn Epstein Aff. ¶ 29.)

39.     At the September 18, 2017 closing, and without the benefit of legal counsel, Mrs. Epstein was given around fifteen minutes or so to review and sign the closing documents, which were approximately 75 pages.  (Marilyn Epstein Aff. ¶ 30.)

40.     Mrs. Epstein does not recall signing the non-homestead affidavit, nor did she understand that by signing the non-homestead affidavit and transferring title to Beit Nes LLC, she  would relinquish her homestead rights.  (Marilyn Epstein Aff. ¶ 31.)

41.     Defendant 5AIF prevented Mrs. Epstein from seeing the non-homestead affidavit and from understanding its contents. As stated, she repeatedly asked to review the closing documents before the closing, which request Defendant 5AIF refused to meet. (Marilyn Epstein Aff. ¶ 32.)

42.     Defendant 5AIF did not require Mrs. Epstein to use the proceeds in excess of the closing costs and refinance costs for construction. The Closing documents included a document entitled, "5 Arch Funding – Renovation Cost Breakdown," which is blank in all budget items, and has a total budget of zero at the bottom. (Marilyn Epstein Aff. ¶ 33.)

43.     Section 4 of the September 18, 2017 re-finance cash-out loan note (the "Note") states that the purpose of the loan is to provide the Borrower with acquisition, refinance and/or construction financing. (Marilyn Epstein Aff. ¶ 34.)

44.     A portion of the September 18, 2017 loan was used to refinance the December 8, 2006 home equity loan. None of the proceeds were used to acquire the Homestead Property. And as specified on the Renovation Cost Breakdown Budget, none of the loan proceeds were targeted for construction. Defendant 5AIF did not impose a draw schedule, as is typically required under a construction loan. (Marilyn Epstein Aff. ¶ 35.)

45.     Defendant 5AIF funded the September 18, 2017 refinance loan in one lump sum. (Marilyn Epstein Aff. ¶ 36.)

46.     Contrary to certain provisions in DOT2, Defendants 5AIF knew that the Homestead Property was Mrs. Epstein's homestead for many years, shortly after which her husband, Mr. Epstein, moved in, that the property was her and husband's homestead at the time of the closing, and that neither her husband nor she ever intended to relinquish their homestead status in the Homestead Property. (Marilyn Epstein Aff. ¶ 37.)

47.     Section 37 of DOT2 states that the September 18, 2017 loan is to refinance the December 8, 2006, home equity loan. (Marilyn Epstein Aff. ¶ 38.)

48.     The Borrower's Closing Statement states at the top, "Refinance – Cash Out". (Marilyn Epstein Aff. ¶ 39.)

49.     The Note specifies an interest only one-year term at an annual interest rate of 9%. The original principal of the Note is $1,625,000. The stated default interest rate is 18%. In paragraph 32 of the Defendant's complaint Cause 1:19-cv-00431 states, as of the filing date, June 25, 2019, the accrued interest is $187,281.25, and $9,246.65 in other fees and charges. (Marilyn Epstein Aff. ¶ 40.)

50.     However, Mrs. Epstein made all payments on time during the one-term timely. Six months and twenty days transpired between the purported maturity date of the Note, October 18, 2018 and May 7, 2019, the date of the foreclosure. According to a default statement the Defendant sent me, 18% of the original principal, default rate, is $24,375; factored by 6 is $146,250; plus the stated per diem rate in the complaint of $510.76 factored by 20 ($10,215.20); equals $156,465.20. On its face the accrued interest of $187,281.25 exceeds the maximum amount of $146,250 by $30,816.05. Further at

least part of the $9,246.65, stated as outstanding fees in the complaint, are late fees. Consequently, some to all of the $9,246.65 would be added to the $187,281.25. (Marilyn Epstein Aff. ¶ 41.)

### The Foreclosure Process

51.     To foreclose under a lien created pursuant to Texas Constitution, Article XVI, §50a(6), such as the Defendant 5AIF's equity lien, DOT2, Defendant 5AIF was required to obtain a Court Order, and the Texas Legislature prescribed Texas Rules of Civil Procedure (TRCP), Rule 736 Orders, for this purpose.

52.     There is no evidence that Defendant 5AIF or the loan servicer obtained a Rule 736 Order.

53.     Without first obtaining a 736 Order, the May 7, 2019 purported substitute trustee sale is *void ab initio*.

54.     On May 3, 2019, the current trustee conducted an unlawful substitute trustee sale and transferred the Homestead Property to Defendant 5AIF at a sale price of $800,000.00, which is only THIRTY-TWO PERCENT (32%) of the estimated market value of the Homestead Property.

### FIRST CLAIM FOR RELIEF
### (Fraud – Common Law, In the Inducement, and Statutory)

55.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in ¶¶ 1 through 54 of this Second Amended Complaint as if fully set forth herein.

56.     Under Texas law, the claim of common law fraud requires that the plaintiff show that: (1) the defendant made a material misrepresentation to the plaintiff; (2) the representation was false; (3) when the defendant made the representation, he knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion;  (4) the defendant made the representation with the intent that the plaintiff should act upon it; (5) the plaintiff acted in reliance on the representation; (6)

the plaintiff thereby suffered injury.

57.     The actions of Byron Lusk and Spencer Weaver, the brokers, who were agents for the Defendant, are imputed to the Defendant.

58.     Mr. Lusk and Mr. Weaver made several false statements, knowing they were false, knowing these false statements would invariably induce Mrs. Epstein to sign the Note and the DOT2; and Mrs. Epstein did enter into the one year contract causing injury to her and her husband, Mr. Epstein.

59.     Mr. Lusk and Mr. Weaver knowingly falsely stated that the impact of Mrs. Epstein's transferring the Homestead Property to Beit Nes LLC would not affect the Epsteins' homestead rights and that they could continue to reside at the property. Evidence that Mr. Lusk and Mr. Weaver knew this statement was not true is that both gentlemen knew the DOT2 had a homestead affidavit and a business purpose and non-occupancy affidavit and said nothing to the Defendants about these provisions. Further evidence that Mr. Lusk and Mr. Weaver knew these statements were false and that Mrs. Epstein would rely on these false statements is that several days before the closing, Mrs. Epstein repeatedly asked Mr. Lusk and Mr. Weaver for copies of the closing documents before the closing, which they refused to give to her, and at the closing Mrs. Epstein had only about fifteen (15) minutes to read seventy five pages with these statements and a non-homestead affidavits buried in the closing documents. Defendant Epstein did not know, understand, or realize that she signed a non-homestead affidavit at closing.

60.     Another false statement Mr. Lusk and Mr. Weaver made was they stated, before the closing, that the Defendant would extend the contract for six (6) months or refinance the Note at the end of the one year term. The DOT2 had no such renewal or extension or refinance provision, and Mr. Lusk and Mr. Weaver knew such provisions were not in the DOT2, which they deliberately hid from

Mrs. Epstein by not giving her sufficient time, as she requested, to read the document.

61. Prior to maturity of the Note, Mrs. Epstein told the brokers that she found a lender who would refinance the Note. However, the brokers convinced her not to get another lender because the Defendant would refinance the Note. To the contrary, five (5) months after maturity of the Note, the Defendant's agents said the Defendant would not refinance or extend the term and demanded payment in full, including five (5) months of interest at a default rate of eighteen percent (18%).

62. Another false statement by the brokers was that they told Mrs. Epstein that the nature of the transaction was residential and not commercial. Evidence of the Defendant's awareness of this falsity is that a few days before closing, the Defendant had Mrs. Epstein transfer the Homestead Property to Beit Nes. On its face, this act was done to circumvent the homestead equity lien provisions of the Texas Constitution.

63. The Defendant itself included a blank Renovation Cost Breakdown budget with a total cost of renovation of zero. The DOT2 and Note restricted the use of the funds for a business purpose, including acquisition, refinance, and construction. There were zero acquisition costs, not even ten dollars, as stated in the general warranty deed, purportedly transferring the property to Beit Nes. The Renovation Cost Breakdown Budget allocated zero funds for construction. And the brokers told Mrs. Epstein that she could use the money for any purpose. The Defendant did these acts to make the transaction appear to be commercial to circumvent the Homestead Equity Lien provisions of the Texas Constitution.

64. The above false statements by the Defendant directly, and its agents, were designed to induce Mrs. Epstein to sign the closing documents and to circumvent the Homestead Equity Lien provisions of the Texas Constitution. After deceiving Mrs. Epstein into believing the Defendant would refinance the Note or extend the term, the Defendant suddenly foreclosed on the Epsteins by causing

them to lose approximately one million dollars ($1,000,000.00) in equity.

65.     Under Texas law, the claim of fraud in the inducement requires a plaintiff to show the elements of common law fraud, in addition to a showing that the plaintiff was fraudulently induced to enter into a binding agreement.

66.     The false statements made by the brokers, the Defendant's agents and the Defendant itself, induced Mrs. Epstein to sign the Note and the DOT2.

67.     Under Texas law, to prevail on a claim for statutory fraud, the plaintiff must show that: (1) the transaction involved real estate; (2) the defendant made a false representation of a material fact or made a false promise to do an act to the plaintiff, or benefited by not disclosing that a third party's representation or promise was false; (3) the false representation was made for the purpose of inducing the plaintiff to enter into a contract; (4) the plaintiff relied on the false representation or promise in entering into the contract; and (5) the reliance caused injury to the plaintiff. The statutory cause of action differs from the common law fraud only in that to recover actual damages, it does not require proof that the defendant made a material false representation knowing it to be false or made it recklessly as a positive assertion without any knowledge of its truth. Under statutory fraud, it does not matter if the Court considers the brokers as independent contractors verses agents, under the latter relationship, the conduct of the agents are imputed on the Defendant. Under the second prong of statutory fraud test above, if the Defendant benefited by not disclosing that a third party's representation or promise was false, the Defendant is imputed with the false representation.

68.     The Note is collateralized by the Property, secured by the DOT2. The false statements made by the brokers, the Defendant's agents, and the Defendant itself, as stated above, induced Mrs. Epstein to sign the Note and DOT2, and were material misrepresentations, because whether the transaction was residential or commercial turns on the false statements. If Mrs. Epstein knew that

transferring title to Beit Nes and signing the non-homestead affidavits would jeopardize the Epstein's Texas Constitutional homestead rights, she would have not signed the DOT2 and the Note.

69.     At the closing, Mrs. Epstein was given fifteen (15) minutes to read and digest seventy-five (75) pages of legal documents. At no time during the term of the Note did the Defendant tell the Epsteins that they could not reside at the Homestead Property or that the Defendant might not extend or refinance the contract. After the closing, the Defendant sent appraisers to the Property and knew Defendant Epstein and her husband resided at the property. Had the Defendant made any mention of the residential-use restrictive language in the Note and DOT1 to Mrs. Epstein after the closing and during the term of the contract, the Plaintiffs would have refinanced the Note, because Mrs. Epstein told the brokers that she had a lender who offered to refinance the Note.

## SECOND CLAIM FOR RELIEF
### (Wrongful Foreclosure)

70.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in ¶¶ 1 through 69 of this Second Amended Complaint as if fully set forth herein.

71.     The May 7, 2019 substitute foreclosure sale was wrongful. Texas law requires that a plaintiff bringing a wrongful foreclosure claim show that there was: (1) a defect in the foreclosure sale proceedings, (2) a grossly inadequate selling price, and (3) a causal connection between the defect and the grossly inadequate selling price. A defect in the foreclosure sale may be established by the foreclosing party's failure to comply with statutory or contractual terms, or its compliance with such terms, with affirmative action that detrimentally affects the fairness of the foreclosure proceedings. The defect must be an event that concerns the foreclosure sale itself and renders the sale unfair or invalid. The Texas Constitution § 50(a)(6)(Q) requires a lender to first obtain a foreclosure order before conducting a non-judicial foreclosure sale. This requirement is one of three prerequisites to conducting a non-judicial foreclosure sale: (1) the lender must send the borrowers a statutory notice to

cure, (2) an acceleration and trustee sale notice, and (3) must obtain a TRCP 736 order.

## Failure to Obtain Mandatory TRCP 736 Order

72.     In order to foreclose under a lien created under Texas Constitution, Article XVI, §50a(6), such as the Defendant's equity lien, the Defendant must obtain a court order, and the Texas Legislature prescribed Texas Rules of Civil Procedure (TRCP), Rule 736 Orders for this purpose.

73.     There is no evidence that the Defendant or the loan servicer obtained a Rule 736 Order.

74.     Without first obtaining a 736 Order, the May 7, 2019 purported substitute trustee sale is void ab initio.

75.     The Defendant did not obtain a 736 order. This defect in the foreclosure process caused the sale of the Property at the unlawful and void auction to be sold at a grossly inadequate sale price. During the May 7, 2019 substitute trustee sale, the current trustee sold the Property to the Defendant for $800,000.00, which is approximately twenty-eight percent (28%) of the As-Is Appraisal the Defendant relied on to loan the Plaintiffs the $1,625,000.00 on September 18, 2017. A foreclosure sale price that is less than fifty percent (50%) of the market value is grossly inadequate and unfair, as a matter of law.

76.     On May 7, 2019, the payoff price of the Note was about $1,800,000.00, leaving the Plaintiffs with a deficiency amount of over $1,000,000.00 The DOT2 expressly states that the Defendant can sue the Plaintiffs for the deficiency amount resulting from a foreclosure sale, which DOT2 provision itself violates the Texas Constitution § 50(a)(6)(Q).

77.     The Defendant, Loan Servicer, nor the substitute trustee obtained a 736 order, nor otherwise complied with Texas Constitution, Article XVI, §50a(6), which requires the substitute trustee to offer or sell the property for the market or appraised value of the Property. The September 11, 2017 appraisal, which the Defendant relied on to close on the September 18, 2017 refinance cash-

out loan to the Plaintiffs, valued the Property at $2,500,000.00. On May 7, 2019, the Substitute

Trustee sold the Property to the Defendant at the substitute sale for $800,000.00, which is less than

fifty percent (50%) of the September 11, 2017 appraisal value of $2,500,000.00. The conduct of the

Defendant and/or the loan servicer, in authorizing the current substitute trustee, without first obtaining

a TRCP 736 order, to sell the property at about thirty-two percent (32%) of the market value, caused

the Property to be sold at a grossly inadequate sale price.

## THIRD CLAIM FOR RELIEF
### (Quiet Title)

78.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in ¶¶

1 through 77 of this Second Amended Complaint as if fully set forth herein.

79.     A litigant who seeks to remove a cloud from a title to property must plead and prove

three basic elements. The petitioner must show: (1) an interest in specific property, (2) that title to the

property is affected by a claim by the defendant, and (3) that the claim, although facially valid, is

invalid or unenforceable. As for the first element, ordinarily, offering proof of record title to an interest

in the property is sufficient. The petitioner's interest need not be a fee simple interest. Nor must the

petitioner be in actual possession of the property. As for the second element, the petition should refer

to the specific document or documents clouding the title, and every document to be declared invalid or

unenforceable should be introduced into evidence. An offending document need not have been

recorded on the public records; its existence and facial validity is all that is required to form the basis

of a suit to remove it as a cloud on the title. The adverse claim clouding the title may be one for

ownership of all or some lesser interest in the property, including a claim for a lien or other

encumbrance. As for the third element, an adverse claim, to constitute a cloud on the title removable

by the court, must be one that is valid on its face but is proved by extrinsic evidence to be invalid or

unenforceable. Thus, the petitioner's pleading and proof in a suit to quiet title must show some fatal

flaw or fallacy that nullifies the claim's apparent effect on the property's title. To do so, the petitioner relies on the law governing the particular transaction alleged to have created the cloud and construct the pleadings and proof accordingly.

### Invalid Homestead Disclaimers

80.     Under Texas law, "homestead" is a legal interest in real property created by the Texas Constitution. A homestead claimant has the initial burden to establish the homestead character of the property.  To satisfy this initial burden, the claimant must show a combination of both covert acts and homestead usage and the intention on his/her part to claim the property as homestead.  Once the claimant has satisfied his/her initial burden, and thereby established the homestead character of the property, the burden shifts to the creditor to disprove the continued existence of the homestead. If the creditor chooses to argue that the claimant signed away its homestead rights in a mortgage or deed of trust, that argument will not be sustained if there is evidence that the creditor in some way prevented the claimant from reading the documents or knowing what they contained.

81.As stated, the brokers only told Mrs. Epstein a few days before the closing that she needed to transfer the property to the entity Beit Nes LLC; and at the time and repeatedly thereafter, the brokers told the Epsteins they would not have to give up their homestead status in the Homestead Property and could continue to reside at the Homestead Property. Further, at the closing, Mrs. Epstein had fifteen (15) minutes to read the closing documents, which were seventy-five (75) pages. And the brokers, the closing agent, nor anyone else mentioned that the closing documents included a disclaimer forfeiting the Epstein's homestead rights.  Mr. Epstein did not read nor sign the closing documents, nor did he attend the closing. Nor did Mr. Epstein realize that by transferring the property to an entity wholly owned by the Epsteins, he would lose his homestead rights.

82.     The Epsteins are the owners of the Homestead Property, as reflected in the attached affidavit, as well as the DOT1. The Defendant recorded a void trustee deed. On its face, the voided

trustee deed appears valid. However, the underlying deed of trust (DOT2) relied on by the current

trustee who signed the voided trustee deed is also void ab initio, because it does not comply with all of

the conditions under Texas Constitution § 50(a)(6)(Q). Further what contributes to the appearance of

validity of the void trustee deed is the fraudulent recorded warranty deed, which was procured by fraud

and is nothing more than a shell to give the appearance that the void DOT2 is valid. Also contributing

to the appearance of validity of the void trustee deed are the homestead and nonowner occupancy and

business purpose affidavits, which Mrs. Epstein may have signed, but was unaware of what she was

signing, because the Defendant prevented her from knowing the true nature of the documents; which

means that procuring Mrs. Epstein's signatures on these affidavits amounted to fraud in the factum. As

previously alleged, the brokers and the Defendant made patently false statements, knowing the

statements were false, for the sole purpose of inducing Mrs. Epstein to sign the closing documents, so

that the brokers and the Defendants could make money.

### FOURTH CLAIM FOR RELIEF
### (Declaratory Judgment)

83.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in ¶¶

1 through 82 of this Second Amended Complaint as if fully set forth herein.

84.     The Plaintiffs seek a declaratory judgment that: (1) the Epsteins are the owners of the

Homestead Property, which is their homestead, because the warranty deed is a shell company for the

purpose of giving the appearance of validity of DOT2 and the Note; (2) the DOT2 and the Note are

void ab initio for failure to comply with Texas Constitution § 50(a)(6)(Q); (3) the May 7, 2019

purported substitute trustee sale is unlawful and the purported trustee deed is void ab initio, because

the Defendant did not obtain a TRCP 736 order; (4) the June 12, 2019 purported special warranty deed

is void ab initio, because the purported trustee deed is void ab intio, the so called grantee of the

purported special warranty is not a bona fide purchaser pending Lis Pendens, and the grantee of the

purported special warranty deed is affiliated with the Defendant.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request relief as follows:

A.      For entry of judgment declaring that the May 7, 2019 purported substitute trustee sale of the Homestead Property is unlawful and *void ab initio*.

B.      For entry of judgment declaring that Defendant 5AIF Sycamore 2, LLC violated the Homestead Rights of the Epsteins, as established under the Texas Constitution.

Plaintiffs pray for general relief.

C.      For an award of damages, attorney's fees, costs and expenses because of Defendant 5AIF Sycamore 2, LLC various illegal acts, as discussed above.

D.      For such further legal and equitable relief as the Court may deem just and proper.

Respectfully submitted,

James Minerve
State Bar No. 24008692
115 Saddle Blanket Trail
Buda, Texas 78610
(888) 819-1440 (Office)
(210) 336-5867 (Cell)
(888) 230-6397 (Fax)
Email: jgminerve@aol.com

/s/ Manotti L. Jenkins
Manotti L. Jenkins
Law Offices of Manotti L. Jenkins, LTD.
150 North Michigan Avenue
Suite 2800
Chicago, Illinois 60601
(312) 208-9537 (Office/Cell)
(872) 228-8153 (Fax)
Email: mj@mljlawoffices.com
Admitted *Pro Hac Vice*

Attorneys for Plaintiffs MARILYN ROTH
EPSTEIN, STEPHAN D. EPSTEIN, and
BEIT NES LLC

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document was sent to the following on this day, November 26, 2019:

Spectrum Association Management, LP
Registered Agent for 5AIF SYCAMORE 2, LLC
17319 San Pedro Suite 318
San Antonio, TX 78232

/s/ James Minerve

_____
James Minerve